Den d. Trumbull et al. v. Gibbons.

---

## DEN D. TRUMBULL ET AL. v. GIBBONS.

1. If a will devise lands to W. and his heirs and assigns for ever, and if W. should die without lawful issue and without leaving a will, or if he should by will, or in any other way, after the date of said devise, give any thing to T., or any of his descendants, then over: this devise vests an estate in fee in the first taker, and the limitation over being upon a *definite* failure of issue, is not void as an executory devise on account of remoteness. If this condition should be held void, as being contrary to policy or good morals, as it is a condition subsequent, it would only defeat the limitation over, and not the estate devised to W.

2. Every testator is presumed to be of sound mind, until the contrary is proved. The burthen of proof is upon the party alleging insanity.

3. A will cannot be set aside on account of any moral obliquity or prejudice of the testator exhibited in the devises in it, or because the disposition of property in it is unnatural or unjust.

4. Strong, violent, and unjust prejudices, if not founded on delusion, do not show mental incapacity.

5. Influence acquired over a testator by kind offices or persuasion, unconnected with fraud, is not such undue influence as would invalidate a will induced by it.

---

This was an action of ejectment, brought to recover a farm, in the township of Elizabeth, in the county of Essex, in pos-

session of Thomas McCullor, known as the Walnut-hill farm, containing two hundred and thirty acres. The declaration contained five counts.

1. One on the joint demise of Thomas Gibbons Trumbull, John Heyward Trumbull, Ralph Henry Isham and Ann his wife, and Daniel Coit Ripley and Sarah his wife.

2. One on the demise of T. G. Trumbull.

3. One on the demise of J. H. Trumbull.

4. One on.the demise of Isham and wife, and

5. One on the demise of Ripley and wife.

The defendant pleaded not.guilty, and the cause was tried at the Essex May circuit, 1848, before the Chief Justice.

On the trial, the plaintiff proved that Thomas Gibbons died many years since, seized of the premises in question. That Thomas Gibbons had had three children, viz: his son William Gibbons, the defendant, his son Thomas Heyward Gibbons, who had died in his father's lifetime, leaving one child, Hannah Wheelwright, and his daughter Ann, who married John M. Trumbull, and died in the lifetime of her father, leaving four children surviving her, to wit, T. G. Trumbull, J. H. Trumbull, Ann Isham, and Sarah Ripley, the lessors of the plaintiff.

The defendant then opened his defence, and offered in evidence the record, from the surrogate's office of the county of Essex, of a writing purporting to be the will of Thomas Gibbons, bearing date the 26th day of October,·1825, with a copy of the proofs and probate, bearing date the 27th day of May, 1826 ; recorded in Book D. of Wills, page 344, &c., for Essex county.

To this evidence the plaintiff, by his counsel, objected, and the court overruled the objection, and admitted in evidence the said record.

The defendant then offered, and read in evidence, the record of Thomas Gibbons Trumbull's discharge under ·bankrupt act —date ·of petition 17th February, 1842, date of decree in bankruptcy 21st March, 1842, and date of final decree 19th July, 1842; also, the record of John Heyward Trumbull's discharge under the bankrupt act, the petition bearing date

23d January, 1843, decree 24th February, 1843, and final decree 8th June, 1843 ; also, the record of Ralph Henry Isham's discharge under the bankrupt act, the petition bearing date October 15, 1842, decree November 18, 1842, and final decree July 18, 1844.

The admission of the record of Ralph Henry Isham's papers was objected to by the plaintiff, but admitted by the court, and read in evidence.

The defendant then rested his cause.

The plaintiff then offered the original will of Thomas Gibbons, from the office of the secretary of state at Trenton, produced by that officer, which will is as follows :

In the name of God, amen. This is the last will and testament of me, Thomas Gibbons, at present of the city of New York, in the state of New York, but late of Elizabethtown, in the state of New Jersey, and formerly of Savannah, in the state of Georgia, esquire, being now, weak in body but of sound mind, preparing to meet the king of terrors, when he shall assail me in the feeble moments of departing life, in the last severe and trying period, that laboring hour of nature, I do make this my last will and testament.

*First.* I recommend my soul to the mercy of my God, through the intercession of my blessed Redeemer.

*Second.* I submit my body to the grave, to be sealed up in expectation of a happy resurrection.

As to the disposition of my estates, which is the sole object of this instrument, it is as follows :

To my son Thomas Heyward Gibbons I confirm a memorandum in writing to him of the Mount Vernon estate, and the negroes therein mentioned, so far as the same does not interfere with the provisions herein after contained in regard to a portion of the property and estate in the said memorandum mentioned, which has since become vested in me ; but I confirm the same to him, on no other condition than is expressed in the said memorandum : and as it is provided in that memorandum, that in case of the failure of issue of my said son, that I shall, by my last will and testament, give the said estate, real and personal, as I shall appoint, I do therefore, by

virtue thereof, appoint, will, and declare, that the said estate, real and personal, shall in that event pass over to my son William Gibbons, of Savannah, and to his heirs and assigns, upon the same terms and conditions upon which my estate, herein after next devised to him, is limited. To my son William Gibbons, of Savannah, I give all the rest and residue of my estates, real and personal, (except such as is herein after devised to my granddaughter Hannah Gibbons) in the states of Georgia and South Carolina, that is to say: my plantations Shaftesbury, Mansfield, Fairlawn, Orange Valley, White-hall, one thousand acres of pine land nearly adjoining, devised to me by my father, a tract of land, adjoining, I bought of Joseph Bryan, formerly called Brack's old field, a tract of pine barren, adjoining the thousand acre tract, bought of Edward Lloyd or Edward Davies, my plantation Rosedew, in Chatham county, and Tusculum, in Scriven county, with all my negro slaves in the states of Georgia and South Carolina; and I give to my said son William Gibbons, of Savannah, all my lots of ground, with the improvements thereon, situated in the city of Savannah; and all this estate in the states of Georgia and South Carolina, as well real as personal, I give to my said son William Gibbons, of Savannah, and to his heirs and assigns, upon the terms and conditions herein after next expressed. And as to my estate in New Jersey, namely, my Rose-hill farm, whereon I formerly lived, (bought of Marroll) which includes a lot opposite the dwelling house lately occupied by me, and also my Wheat-patch farm and triangular lot, which I bought of Jonathan Dayton, and also two meadow lots on the Edgar road, and also a lot, nearly opposite to my above mentioned dwelling house, which I bought of Luke Tucker; the lots on the Edgar road, just mentioned, were bought, one from Mrs. Baldwin, the other from Josiah Hunt; and also a house and lot on the turnpike road, bought of George C. Thomas, formerly occupied by Mrs. Jenkins, and also my Walnut-hill farm, bought of Hugh Webster, and the salt meadow lots, bought of Jonathan Mulford, Noah Crane, and Jacob Crane, and Cowper Woodruff, also a four acre lot on the Sound, bought from the heirs of Ogden, and my two farms Rising

sun, bought of Peter Coriell, and Howard's farm, bought of Howard, also a lot adjoining the Rising sun farm, bought of Ogden, with two small pieces of ground bought of Butler, and all my estates in the states of Georgia, South Carolina, and New Jersey, herein before mentioned ; and also three lots of land, with the improvements thereon, situated and being in the city of New Brunswick, county of Middlesex, and state of New Jersey, at present in the occupation of Cornelius Vanderbilt, and lately purchased of James Murphy, as appears by deed of the said James Murphy and wife, dated November first, in the year one thousand eight hundred and twenty-three, and also a large dwelling house in Elizabethtown, used as a tavern, and called the Union hotel, with all the houses, lots, and premises thereto belonging, now in the occupation of William Craig, and also a lot adjoining thereto, bought of Isaac Williamson and Benjamin Williamson, and also a small lot in the rear, down a small street, bought of Thomas Price: all which said premises and estates, real and personal, in Georgia, South Carolina, and New Jersey, I give and devise, and bequeath, to my beloved son William Gibbons, of Savannah, and to his heirs and assigns for ever, upon this special limitation and condition, that in case my said son William Gibbons, of Savannah, shall die without lawful issue, then my said estates, real and personal, in Georgia, South Carolina, and New Jersey, shall be sold at public auction, to the best advantage, by order of some court having due authority in such cases, agreeably to the laws of the several states where the estates severally lie ; and the proceeds of which sales shall be divided into three equal parts or shares, one share of which shall go and be paid to the church wardens and vestry of the Episcopal Church in Savannah, to and for the use of the said church ; another equal third part or share shall go and be paid to the officers or managers of the Poorhouse and Hospital of Savannah, to and for the use of the said institution, and the remaining equal third part or share shall go and be paid to the officers or managers of the Female Asylum in Savannah, to and for the use of the said institution ; and if it shall happen from any cause whatsoever, either from the want of an act of incorporation or from any

other cause, or from any disability whatsoever, that it shall be deemed or adjudged that either of the said institutions, to which the said proceeds are directed to be paid as aforesaid, shall be, or is incapable of taking, using, and enjoying the share of the said proceeds, so intended to go and be paid to them, respectively, as aforesaid, then and in such case the said share of the said proceeds shall be divided equally between, and be paid to the other two said institutions which may be deemed and adjudged capable of taking their respective share of the said proceeds, so given to them as aforesaid, to be used and enjoyed for the same uses and purposes as the other portions of the said proceeds, so given as aforesaid, are respectively above directed and expressed, and intended to be; and if more than one of the said institutions, to which the said proceeds are so given as aforesaid, shall be deemed and adjudged incapable of taking, using, and enjoying the respective shares of the said proceeds, so given to them respectively as aforesaid, then and in such case the whole of the said proceeds shall go and be paid to the remaining institution, so deemed and adjudged capable of taking, using, and enjoying the one third part of the said proceeds so given to the said institution as aforesaid. I do hereby mean and intend that all the property, real and personal, given, devised, and bequeathed to my said son William Gibbons, of Savannah, shall by no casuality in this life go to John M. Trumbull, or all or any of his children, or one or more of their or either of their descendants.

And I also give, devise, and bequeath to my said son William Gibbons, of Savannah, my Swamp plantation in South Carolina, on Savannah river, also my plantation in Chatham county, Georgia, called Moreland, also a small farm or tract of land, in Elizabethtown, New Jersey, called Long payment, bought of Elias B. Dayton, also a lot of land, in Morris county, New Jersey, called the Mountain lot, now in the occupation of Daniel Phœnix, also all my bank stock in New York, New Jersey, and Georgia, and all money in any bank in either of the states, and also all my steamboats and sail boats, with their appurtenances, and all money due to me, and all my plate, household furniture, and stock of liquors, in Georgia or

elsewhere, and also all the rest and residue of my personal estate in New York, New Jersey, and Georgia, which I may die possessed of, to him, the said William Gibbons, his heirs and assigns for ever, without any other condition or limitation, than that no part thereof shall be given, directly or indirectly, by my said son William Gibbons, of Savannah, or in any way descend to John M. Trumbull, or any of his children, or their or either of their descendants; and in case my said son William Gibbons, of Savannah, shall die without first making such disposition by will, or otherwise, of the estate, real and personal, herein last above devised and given to him, so as to place the same wholly and entirely beyond the possible reach of John M. Trumbull and his children, and their and every of their descendants, then and in such case my will is, that the said last mentioned estate, real and personal, shall pass in like manner and upon the same terms with the other parts of my estate herein before devised and given to my son William Gibbons, of Savannah. Having heretofore given to my said son William Gibbons, of Savannah, and having had deeds made in his name for the water lots in the city of New York, purchased from James Arden and others, and the steamboat hotel, bought of John Kearny, situated at Marketfield-street, in said city, I do confirm the same to my said son William Gibbons, of Savannah. And I do hereby give and devise to my granddaughter Hannah Gibbons, the daughter of my son Thomas Heyward Gibbons, and her heirs, all that body of land, situate, lying, and being in the county of Scriven, in the state of Georgia, and known as the Mount Vernon estate, composed of several tracts of land, containing thirty-seven hundred acres, more or less, with the hereditaments and appurtenances thereto belonging; which said premises are described in an indenture or deed of conveyance, bearing date on or about the thirteenth day of March, in the year one thousand eight hundred and twenty-five, and made between Samuel B. Parkman, of Savannah, in the state of Georgia, merchant, of the first part, and myself, the said Thomas Gibbons, of the second part, recorded in Chatham county clerk's office, in Georgia, in book N. N., folios one hundred ninety-nine and two hundred,

and also recorded in Scriven county clerk's office, in Georgia, in book L., folios one hundred and twenty-seven and one hundred and twenty-eight, to have and to hold all and singular the said premises, with the appurtenances, unto my said granddaughter Hannah Gibbons, her heirs and assigns for ever, in fee simple, but upon this condition: that John M. Trumbull, or any of his children, or their or either of their descendants, shall, in no possible event whatsoever, inherit any part of the said lands and premises so devised to her, and that the said Hannah Gibbons shall not, by any devise or other disposition of the said lands and premises hereby devised to her, vest the same, or any part thereof, or interest therein, in the said John M. Trumbull, or any of his children, or their or either of their descendants, either directly or indirectly, by deed of trust or otherwise; and in case of the death of the said Hannah Gibbons without being married or leaving lawful issue her surviving, or without making any disposition of the said lands and premises, by will or otherwise, in conformity with the provisions and intentions of this my last will and testament in relation to John M. Trumbull, his children, and their descendants, then and in such case I give and devise the said lands and premises to my son William Gibbons, of Savannah, under the same limitations and upon the same conditions as are herein before expressed in relation to the Tusculum estate, hereby devised to him under the second devise to him herein before contained, in preference to the said John M. Trumbull, or all or either of his children, or their or either of their descendants, who might otherwise be deemed entitled thereto, as heir-at-law or otherwise. All these devises and dispositions of my estate I do so limit and restrain, and I trust I have so limited and restrained, and so excluded the said John M. Trumbull and his children and descendants, that no court in the United States can construe that any part or portions of the same can go, by any possibility, to the said John M. Trumbull, or any or either of his children, or any person descended from him. And I intend further, that my estate shall be so limited and restrained, that in no possible event, either by the death of my son, the said William Gibbons, of Savannah, or

oᶠ my granddaughter Hannah Gibbons without will, or any will he or she may make, shall the children of the said John M. Trumbull, or John M. Trumbull himself, or any of his or their descendants, acquire or inherit one cent of my estate. And as I reserved to myself the right and power, in and by my deed of the farm called Slovenly, where that man John M. Trumbull now resides, to declare in my will, or otherwise, who shall have or inherit the same after the death of Thomas G. Trumbull, should he die before he attains the age of twenty-one years, all which will appear by my deed of gift to him, duly recorded, I do, authorized as aforesaid, appoint Ann Trumbull, the oldest sister of the said Thomas, to be the person who shall take, possess, and enjoy the said farm and premises to her, her heirs and assigns, for ever; and my said estates, real and personal, in the states of Georgia, New Jersey, South Carolina, and New York, are given, devised, and bequeathed to my said son William Gibbons, of Savannah, upon the following further conditions, that is to say: if he should die without any lawful issue and without making a last will and testament, or if he should make a last will and testament, and thereby devise or bequeath any part of my estate, devised or bequeathed to him in this my last will and testament, to John M. Trumbull, or to his children, Thomas G. Trumbull, John H. Trumbull, Ann G. Trumbull, and Sarah B. Trumbull, or their or any or either of their descendants, or to any person in trust for all or either of them, or of any part of the proceeds or usufruct of my estate while in his possession; or if it shall appear, after his death, that my said son William Gibbons, of Savannah, had in any period of his life, after this date, given any property of any kind, or money arising from what funds or source it may (even if it shall be from property I have already given to my said son), to the said John M. Trumbull, or either of said children or descendants, then and in any such case the estate, by this my will devised and given to my said son William Gibbons, of Savannah, shall go to the public uses herein before expressed, directed, and intended, and not pass by any such his deeds or testamentary dispositions. And I do pray to that God, before whom I am shortly

to appear, that I have been enabled so to devise and bequeath my whole estate, real and personal, that no events may or possibly can arise, in 'all the changes of this changing world, that will enable John M. Trumbull, or any of his children, or any person descended from him, to be benefitted one cent, or the value thereof, from my estate; meaning, resolving, and intending that they shall be for ever excluded to the end of time, in as conclusive a manner as if the said John M. Trumbull had never been married, and as if all his children by Ann Gibbons · were illegitimates.

And I hereby give and bequeath the sum of five hundred dollars to each of the children of my deceased brother Joseph Gibbons, late of Georgia, that may be alive at the time of my decease, to be paid to them, respectively, within twelve months after my decease. I also give the sum of one hundred dollars to Elizabeth Cook, my housekeeper in Savannah. I also hereby give and bequeath unto Elizabeth Covert, now a servant in my house, and who has served me ten years last past, the sum of twenty-five dollars a month during the term of her natural life, to be paid to her monthly by my executor, herein after named, the same to commence from the day of my death; and all delays of payment of this bequest, in manner prescribed, shall carry an interest of seven per cent. per annum. I also give to Henry Parsell the sum of twenty-five dollars, if he shall be in my service at the time of my decease. And to the said son of Belinda Mead, called Thomas Brown, now about seven years old, I give and bequeath the sum of twenty dollars a month, to be paid monthly into the hands of Luke Tucker, of Elizabethtown, New Jersey, for the use and maintenance of the said child; and I appoint the said Luke Tucker testamentary guardian of the said child; this bequest to commence from the day of my death, and the same shall be paid until the said Thomas Brown shall attain the age of twenty-five years; and all delays of payment by my executor shall carry an interest of seven per cent. till paid. And whereas I may have omitted enumerating and specially disposing of the whole of my estates, real and personal, and of every description whatsoever, in Georgia, South Carolina, New Jersey,

New York, and elsewhere, devised to my son William Gibbons, of Savannah, I do hereby further declare it to be my will and intention, that the whole of these estates, real and personal, and also all the estate, real and personal, I now hold in this world, or whereof I may die seized and possessed, shall go to my said son William Gibbons, of Savannah, on the limitations and conditions herein before mentioned. And, lastly, I do hereby appoint my son William Gibbons, of Savannah, sole executor of this my last will and testament, and hereby I revoke all former wills and testaments, and papers or writings in the nature thereof, heretofore made by me. In witness whereof, I have hereunto set my hand and seal, at the city of New York, this twenty-sixth day of October, in the year of our Lord one thousand eight hundred and twenty-five.

TH. GIBBONS.　　[L. S.]

Signed, sealed, published, and declared, by the said Thomas Gibbons, the testator, as and for his last will and testament, in the presence of us, who have hereunto subscribed our names, as witnesses thereto, in the presence of the said testator, and in the presence of each other.—The word "otherwise," between the 22d and 23d lines of the 6th page, and the words "of my estate," between the 23d and 24th lines of the 6th page, being first interlined, and the word "himself," in the 23d line of the 6th page, obliterated with a pen.

WM. TALMAGE,
WILLIAM JAQUES,
JAMES ANDERSON.

I, William Gibbons, of Savannah, the devisee within mentioned, do solemnly covenant and agree with my father, the testator, that I will faithfully perform the conditions of his last will and testament, and that I will not, under any circumstances, lend or give one dollar, or the value thereof, to John M. Trumbull, or to any one or either of his children, during my life; nor will I, by any last will or testament, or by any testamentary disposition, give to him or either of them any part of the estate herein before devised to me, or which I hold

by any donation from my father, or any money or property growing out of the same, or that I may die possessed of.

In witness whereof, I have hereunto set my hand and seal, this twenty-sixth day of October, one thousand eight hundred and twenty-five.

                                    WM. GIBBONS.    [L. S.]

    Signed, sealed, and acknowledged in presence of,
                    WM. TALMAGE.

The execution of the will and covenant was proved by the subscribing witness.

The general sanity of the testator was proved by several witnesses, who showed that he was a man of strong intellect, energetic, and self-willed.   It was further shown that the testator was a libertine and debauchee, and indulged his propensities in the grossest forms, unrestrained either by principle or regard for decency ; that he kept lewd women in his house, by which his wife and family were driven from it ; that his daughter Ann and her husband John M. Trumbull, had taken part with the testator's wife, and against him, in the family difficulties arising out of this ; that the testator caused to be prepared, by the encouragement and under the direction of his son, the defendant, a pamphlet, which was printed at Boston, containing the foulest and most unnatural charges upon his wife and daughter, and upon John M. Trumbull ; that Trumbull brought a libel suit against him, in which he recovered fifteen thousand dollars damages ; that the testator was much enraged at this, and declared, from this time forward, that this was all that Mr. or Mrs. Trumbull, or their children, should receive of his estate.   His diary was also offered in evidence, showing that this feeling was sustained and nourished during the rest of his life.   A former will, executed in 1819, and codicils thereto, executed, respectively, in 1821, 1822, and 1823, were offered in evidence, containing devises and directions, so far as regards the Trumbulls, in the same spirit as those in his last will, and with like covenants by William Gibbons annexed.

Evidence was also given to show that, after the death of Mrs.

Trumbull, a bill was filed, in 1819, against the testator, in the names of the lessors of the plaintiff, then infants, by their next friend, and that the litigation in chancery was continued for years.

The will was drawn by Mr. Talmage, a counsellor in the city of New York. He was waited on by William Gibbons, who went with him to his father, and found him reclining on a sofa. William, at his father's request, got the old will and papers, and handed them to him. The testator and scrivener went over them together. His intellect was vigorous, and he gave all the instruction as to the preparation of the instrument. The will was drawn at William's room, because it was more retired, and the attorney would be less liable, as he said, to interruption there than at his own office. William aided him in the preparation. When it was completed, it was taken back by the attorney, read to Mr. Gibbons, fully understood and approved by him, and afterwards executed in the presence of witnesses whom the testator well knew, and who well knew him. The will was substantially the same as the former will and codicils. No alteration was made in favor of William Gibbons.

The CHIEF JUSTICE charged the jury as follows :

This action is brought for the recovery of the one equal undivided third part of a farm, of two hundred and thirty acres, in the township of Elizabeth, known as the Walnut-hill farm. The lessors of the plaintiff claim title to the premises as the heirs-at-law of Thomas Gibbons.

In support of their claim, they prove that, in or about the month of May, 1826, Thomas Gibbons died seized of the premises, which were conveyed to him in fee simple from Hugh Webster and wife, by deed dated the 20th of October, 1815. That Thomas Gibbons (the ancestor) had three children, *viz :*

1. William Gibbons, the present defendant, his youngest child, who alone, of all his children, survived him.

2. Thomas Heyward Gibbons, who died in the lifetime of his father, leaving issue one daughter, Hannah, who still survives.

3. Ann, who married John M. Trumbull, and died in the lifetime of her father (on the first of June, 1817,) and left surviving her five children, one an infant, who died shortly after her mother; the other four children are the lessors of the plaintiff.

1. Thomas Gibbons Trumbull.

2. John Heyward Trumbull.

3. Ann Heyward, who intermarried with Ralph Henry Isham.

4. Sarah B., who intermarried with Daniel Coit Ripley.

These four children of Ann Trumbull, the daughter of Thomas Gibbons, are now before you, claiming their share of the estate of their grandfather, as his heirs-at-law.

Upon this statement of facts, it is apparent that the real estate of Thomas Gibbons descended to, and vested in his heirs-at-law in three equal portions, as follows, viz: one equal undivided third part to the defendant, William Gibbons, one other third to his granddaughter Hannah, and the remaining third, the share of the mother, Ann Trumbull, in four equal portions, to his four grandchildren, the lessors of the plaintiff. Each of them, therefore, became entitled to the one fourth of one third, or, in other words, to one twelfth of these premises.

By this evidence the lessors of the plaintiff establish a clear title, as the heirs-at-law of Thomas Gibbons, to the one equal third of the real estate whereof he died seized, and consequently, in the absence of other proof, they would be entitled to your verdict for the one equal third of the farm in question.

The plaintiff's title (you will observe) rests entirely upon the ground, that Thomas Gibbons died intestate, or without will. They claim as heirs-at-law, by descent from their grandfather. If the land was devised, they cannot, of course, take by descent.

1. The defendant, by way of defence, claims title to these premises under Thomas Gibbons, by virtue of his last will, and that, therefore, no title vested in the plaintiff. The question, therefore, for your consideration is this: did Thomas Gibbons leave a last will and testament?

The defendant, in the second place, insists, in case any title whatever vested in the plaintiff, as to three of them, it has since been divested by bankruptcy, and, as to their shares, there can be no recovery. As this latter defence extends only to a part of the premises, and does not affect the main question, I call your attention first to this branch of the defence. It is shown that Thomas Gibbons Trumbull and John Heyward Trumbull, two of the sons of Ann Trumbull, and Ralph Henry Isham, who married Ann, one of the daughters, have taken the benefit of the bankrupt law. That law declares that all the property, and rights of property, of every name and nature, and whether real, personal, and mixed, (excepting certain property specially exempted in favor of the bankrupt and his family) is by force of the decree in bankruptcy divested out of such bankrupt, and vested in his assignee.

All the right, title, and interest, therefore, of Thomas and John Trumbull, and of Ralph Henry Isham, in the estate of Thomas Gibbons was divested by their bankruptcy. For these shares no recovery can be had in this suit. It is truly said, that the right of Mrs. Isham still remains unaffected by the bankruptcy of her husband; it is undoubtedly so, that nothing passed but the interest of her husband; and that upon his death her rights will remain in full force. It is equally true, that in this suit her rights cannot be enforced. It is also alleged that Mr. Isham purchased from the assignee in bankruptcy of Thomas Trumbull, and that he received that share.

My charge, however, to you is, that the title to that share is not in Isham, or, if it is, cannot be recovered in this action. The title being in himself, a valid demise could only be made by Isham alone, and there is no such demise contained in the declaration.

That reduces, gentlemen, the subject of controversy in this cause to the one twelfth of this farm, the share claimed by Daniel Coit Ripley and Sarah his wife. As to that share, the right of the plaintiffs has not been divested; if it ever vested, it still remains in them, unbarred by lapse of time or other cause.

The question then recurs, did Thomas Gibbons leave a valid

last will and testament? This question retains all its importance, and the great interest at stake, the important principles involved, and the learning that has been enlisted in their support, all require at your hands the calmest and fullest investigation of the question submitted for your decision.

It is said, that admitting this to be the will of Thomas Gibbons, that it was duly made and published as his will, and that at the time of making it he was of sound and disposing mind and memory; yet the will itself is upon its face illegal, immoral, and void.

Its illegality and immorality are said to consist in this : that the testator, by his will, so limited the devise to William Gibbons that he could not convey it to Trumbull or his heirs; that there is an expression in the will, that it was the intention of the testator that the heirs of Trumbull, to the remotest generation, should never inherit any of his estate. This declaration of his intention is no limitation or condition of the estate granted.

The condition annexed to the devise is simply this : if William Gibbons died without issue and without a will, it shall go over to certain public or benevolent institutions; that if he gives, in his lifetime or by his will, any part of the estate to Trumbull, or any of his descendants, he shall forfeit the estate so devised to him. Now suppose this condition is void, what then? the estate is clearly vested in the devisee. It is not the condition upon which it is to be vested, but upon which it is to be forfeited. If, then, the condition be void, the devise does not fail, but vests absolutely in William Gibbons.. Is, then, the instrument produced by the defendant the last will and testament of Thomas Gibbons? If it is, the cause is at an end, your verdict must be for the defendant.

This inquiry resolves itself into two, *viz:*

1. Is the instrument executed with due legal formalities to make a valid disposition of real estate? Upon this point there is no difficulty; the evidence is very clear and explicit that the will was duly signed, executed, and published by the testator, in the presence of three subscribing witnesses.

2. Does the instrument in question contain the will of the

testator? did he execute it freely, knowingly? and was he at the time of its execution of sound and disposing mind and memory? I say at the time of its execution, for this is the material point of time to which your investigation is to be directed; the state of the testator's mind, before and subsequently, is material only as it tends to throw light upon its condition at the time he executed the will. It is competent, only as it may aid you in making the inquiry, was he of sound and disposing mind and memory when he executed the instrument under which the defendant claims? The presumption of law is in favor of sanity, the burthen of proof is upon him who denies it. When, therefore, the execution of the will has been proved, accompanied with the requisite legal formalities, it is incumbent on the parties who seek to impeach the validity of the will, to make out, to the satisfaction of the jury, the want of testamentary capacity.

But, gentlemen, what is testamentary capacity? what is that sound and disposing mind and memory, of which the law demands that every testator shall be possessed, to enable him to dispose of his property by last will and testament? It may be answered negatively, that the law does not require, in order to constitute testamentary capacity, a mind unimpaired by age, by disease, or by infirmity, or by dissolute habits; old age, sickness, infirmities, intemperance, do not necessarily take away the capacity of making a will. The mind may be impaired by age, weakened by disease, shattered by long continued habits of intemperance or licentiousness, and yet the testator, in the eye of the law, be capable of disposing of his property by will.

The test which the law applies is a practical one. Was the testator, at the time of executing the will, capable of discerning and feeling the ties of kindred and obligations of family and blood?

Had he a mind to recollect the property he means to dispose of, the persons who are to be the objects of his bounty, and the manner in which it is to be distributed between them? To sum up the whole in the most simple and intelligible form, were the testator's mind and memory, at the time he executed

the will, sufficiently sound to enable him to know and understand the business in which he was engaged? Was the mind of Thomas Gibbons, on the 26th of October, 1825, when he executed the instrument now offered as his will, sufficiently sound to enable him to know and understand the business in which he was engaged? The first and most material testimony upon this point is that of the subscribing witnesses to the will: they are placed by the law around the testator to guard him against fraud and imposition, and to attest to his condition at the time of executing the will. The subscribing witnesses to this will are, William Talmage, the attorney and scrivener who drew it, James Anderson, the family physician, who attended the testator during his illness, and William B. Jaques, an agent of the testator, employed by him in the management of his business. It is not superfluous to remark, that it would be difficult to select three persons who, from their position and relation to the testator, would have better opportunities of ascertaining the state of his mind, and be better qualified to judge and speak understandingly of his capacity. The agent is dead. The physician and attorney have been produced, and both speak clearly and decisively as to the general capacity of the testator when he executed the will. Doctor Anderson testifies—that he commenced attending the testator in Elizabethtown, in the summer of 1823, the summer previous to his removal to New York. He testifies—I saw the testator sign the will; his mind, I think, was perfectly sound; I say this without hesitation. I am in the habit of attending persons insane and under delusion: the testator was under no delusion; I am perfectly satisfied upon that point. He could not be easily controlled, he was a firm decided man in his opinions and conduct; he was naturally a man of strong mind and strong feelings. Again, he says, I attended him all the time he was in New York. He had a paralysis; the effect of the paralysis would depend upon the seat of the disease, whether it reached his mind or was confined to his muscles; in his case it was confined to his muscles.

The defendant further produces Dr. Trenor, a physician and dentist, who saw him in August and September, the two

months preceding the execution of the will. He saw him but twice, and on one of these occasions but for a short period; on one of these occasions, he says "I had considerable conversation with him: I was struck with the clearness and collectedness in his remarks, especially in reference to the state of his health; my impression was, that he was as clear and intelligent as any person I ever conversed with; I should think his mind perfectly clear, and sufficient for any business purpose."

The other witnesses, who speak of the state of the testator's mind nearest to the period of the execution of the will, are, Maria Van Cott, a servant in the family from the summer of 1825 till a few weeks before his death, who was much about the person of the testator; Eliza Coles, who visited him almost daily; Capt. Cornelius Vanderbilt, his confidential agent; George Abbe, James P. Allaire, and Samuel Dawes, who occasionally saw and conversed with the testator. Mr. Abbe testifies—I became acquainted with the testator in 1824. I accompanied him from Elizabethtown Point to New York; from that time till his death I saw him often. His mind was very strong, and continued so; I never saw any variation in it till his death. I last saw him a week or ten days before he died; I saw him almost every Sunday afternoon. In conversation he showed no weakness of mind, though his body was feeble. Cornelius Vanderbilt was in the testator's employ from 1818 until his death; he was in the habit of seeing the testator very often, especially in the absence of his son William, when he received his instructions from the testator. Captain Vanderbilt testifies—I think he was one of the strongest minded men I ever was acquainted with; I never knew any man that had any control over him, nor do I believe that any human being ever had; some persons had influence with him, I believe I had. I do not know that William Gibbons ever started a project which his father did not originate. I never saw any failure in his mind. I last saw him in April, 1826, before he died in May; I did business with him then; I thought him as capable of business then as he ever was; there was no failure in his mind in the fall of 1825.

These nine witnesses speak of the condition of the testator's

mind, from the period of his removal from Elizabethtown to New York, in the summer of 1824, at the precise time of the will, in October, 1825, and down nearly to the period of his death, in May, 1826. They are the only witnesses who speak of his condition during this period, or within many months of the date of the will. They all concur in opinion as to his mental capacity; if they are to be believed, their evidence puts the question of the general sanity of the testator entirely at rest: no one impugns their testimony, no one testifies to the contrary. In addition to this testimony, as to the state and condition of the testator's mind during his last illness, and at the time of executing the will, we have this emphatic testimony of the character of the testator from Mr. D. B. Ogden: "I considered Thomas Gibbons a man of very strong mind, of very strong passions, of very strong prejudices, and very strong self-will."

But the plaintiff's counsel do not rely upon the general insanity of the testator to impeach the will. It seems to be conceded that general insanity did not exist: it is insisted, however, that the testator labored under partial insanity, monomania, or derangement upon one subject, *to wit*, in relation to his son-in-law Trumbull and his children, and that William Gibbons obtained the will by undue influence or by fraud and contrivance. Upon this part of the case the first ground of impeaching the will is, that it was procured by undue influence on the part of William Gibbons. All influence on the part of the devisee in procuring a devise in his favor is not undue influence. The influence of affection, of kind offices, even of persuasion, does not invalidate a will, otherwise the very motive to the testator's benevolence would make void the gift.

The influence which the law denounces as undue influence over a testator, must be such as to destroy his free agency, and amounts to moral or physical coercion: it must be proved, moreover, that the act done was the result of such coercion; there must be a control exercised over the mind of the testator, or an importunity practiced which he could not resist, or to which he yielded for the sake of peace. It is shown, in support of this allegation, that William Gibbons, the principal de-

visee, had an active participation in the preparation of the will: he procured the attorney who drew it; he accompanied him to the house of the testator; he was present at the house, and, so far as the attorney can recollect, in the room when the instructions were given, and when the will was executed, and whenever the attorney saw and conversed with the testator.

The will was drawn not in the house of the testator or in the office of the attorney, but at the lodgings of the devisee. The devisee actually took part in preparing the draft of the will, and paid the attorney his fees for drawing it; and not only so, but, at the time of the execution of the will, he entered into a covenant with his father to hold the property upon the condition upon which it was devised to him. I am asked to charge that that is a part of the will. But why so? It being written on the will makes it no part of the will; it is a mere covenant to perform the will. These circumstances are certainly calculated to excite attention and to call for diligent investigation and scrutiny; they do not, of themselves, produce undue influence or influence of any kind, but they show that William Gibbons stood in a position where it might readily and naturally have been exercised; and if the testator had been of feeble and irresolute mind, under the control or dictation of his son, dependent upon him for his living as a member of his household; if the son had been continually with his father, and all other persons excluded from intercourse with him, the participation of William in the preparation of the will would have been entitled to very great weight in your deliberations. And where the testator was very infirm, and the will executed in the article of death, it has been rightly held that the preparation of the will by the principal legatee was conclusive against its validity; it induced the belief that the will was not the will of the testator, but of the party benefited by it. But when it is recollected that the testator was a man of strong mind and strong self-will, a man over whom, in the language of one who knew him intimately, no human being had any control; that he was at this very time in the full vigor of his intellectual powers; that he was in no wise dependent upon his son; that he did not reside with him; that

he was in the habit of free intercourse with others, and that there is no pretence that any one was excluded from his presence; above all, when it is remembered that the attorney received his instructions from the testator himself, and not from the devisee, and that the principal, if not the entire provisions of this will in favor of William Gibbons had been prepared by the testator in his own writing years before, the suspicion which would naturally attach to the participation of William Gibbons in the preparation of the will, is in a great measure removed.

These circumstances admit of a fair explanation. The mere fact, that a son participated in the preparation of his father's will, or that he actually drew it, does not of itself invalidate the will. And in the absence of all proof of any influence, undue or otherwise, exercised by the devisee over the testator, it is in strict accordance with reason, justice, and the rules of law to put a fair and favorable construction upon his conduct.

But it is said that the testator labored under a monomania in regard to Trumbull and his children; that William Gibbons artfully administered to this delusion, and thus, by fraud and artifice, supplanted the family in the affections of the testator, and secured the estate to himself.

To establish the existence of this delusion, the plaintiff relies mainly upon the contents of the will, of certain diaries, written by the testator, and put in evidence by the defence, and of a libel published by him in 1816. These documents will be all before you. It is needless that I repeat, or particularly advert to their contents; they certainly exhibit a painful, humiliating, mortifying spectacle of human passion and human depravity; it would seem well nigh incredible that the author of those productions could be sane; that a husband should thus address his wife; that a father should thus assail the purity of an only daughter, should proclaim to the world his own and his family's shame; that he should spread upon his will the record of his deep malignant feelings toward the offspring of his own loins, his own flesh and blood, and thus perpetuate the record of his own and his family's infamy, are calculated to create the impression, if not the hope, that the

author was a maniac. But the inquiry with you will be, was the man deranged, in the appropriate technical sense of the word, or was he merely the victim of unbridled passion? was reason dethroned, or had passion seized the rein and acquired mastery? was the voice of reason silenced, or was it merely unheard and unheeded amid the loud clamor of contending passions? I need not say that there is a line, broad, clear, and well defined, though to our imperfect senses ofttimes imperceptible, between the maniac, the man irrational and irresponsible, and he whose soul is seared by the burning lava of human passions. In balancing the weight of the testimony upon this point, the origin, the nature, and duration of the resentment of the testator against his son-in-law and his family are worthy of your particular attention. The resentment did not originate in delusion, it was a reality; it was not a sudden caprice, it was an abiding feeling, extending and deepening through many years; it had its origin, according to Mr. Trumbull's testimony, in 1812, in consequence of Mr. Trumbull's remonstrating, with great propriety, against the licentious conduct of Mr. Gibbons in the family of his daughter.

Here was a provocation, just or unjust, right or wrong; it was a reality, not a delusion, and the headlong fury of that lust, which polluted the purity of his daughter's household, which tainted the sanctity of his own hearth, was not likely to be checked in its career by the remonstrance of a young man, and that man a son-in-law; it was not unnatural that the interference should be deeply felt and keenly resented; it was the bitter hatred which vice bears to virtue, the keen resentment which licentiousness ever manifests against that purity which is its reproach. This feeling was again revived, after a brief temporary suspension, in 1814, by the very same cause. It then broke out in all its bitterness in the publication of the libel which is in evidence.

In 1817 Gibbons declared, through Luke Tucker, to Trumbull, that if he continued the libel suit he would cut him and his children off for ever. This libel suit was instituted in 1816, and brought with it, doubtless, irritation and bitterness. In 1818 the testator declared to Mr. Ogden that he had made

his will ; that he had cut Trumbull off, and had so disposed
of his property that neither he nor his children should have a
cent of it.   He turned a deaf ear to Mr. Ogden's remonstrance.
A few months afterwards he declared to Allaire that Trum-
bull was a fool for taking $15,000, instead of one-third of his
estate.   In 1819 he executed a will, which is before you, car-
rying this long cherished purpose into effect, if it had not al-
ready been, as he declared to Mr. Ogden in 1818.   In 1822
and 1823 he renews the same declaration, and avows the
same determination by two successive codicils, notwithstand-
ing the reconciliation of 1820 or '21, and in 1825 he completes
his purpose by the execution of the will in question.   You see
that this was not a delusion, but a reality ; it was not a temporary
passion, but an abiding resolution, early formed and constantly
adhered to.   Another circumstance ought not to escape your
attention, not a witness has been · produced to testify to the
existence of this alleged delusion or mania during the life
of the testator.   Numerous witnesses are yet living who knew
him well during the whole period of this alleged insanity ; he
was engaged in active and extensive business, in extensive in-
tercourse with those around him, and yet, so far as appears by
the evidence in this case, this insanity was never alleged or
suspected in his lifetime.   He was prosecuted and held liable
by a jury for this very libel, which is now relied upon as the
main evidence of his insanity ;  and yet if he was insane, if
he labored even under this moral mania, which is now set up
as a reason for depriving him of the control of his property,
he would not have been held responsible for that act.   But
there are here witnesses before you who knew the testator,
and conversed with him upon the very subject upon which
his insanity is alleged to exist, neither of whom intimate the
least suspicion of his insanity—I allude particularly to Mr.
Trumbull and to Mr. Ogden.   The testator's conversation with
Mr. Ogden, especially, has been urged upon you as affording
the strongest evidence of the testator's insanity, and certainly
there is nothing in the cause which exhibits more strikingly
the character of the testator's feelings and the temper of his
mind.   And yet it seems never to have occurred to Mr. Ogden,

an intelligent man, a keen observer, and a competent judge, that there was any insanity in the testator's mind ; on the contrary his testimony is, that he was a man of strong mind, strong passions, strong prejudices, and strong self-will. And yet you are now called upon, after the lapse of more than twenty years, upon such evidence, to impeach this will because the testator was insane. I do not say it may not be done, but I respectfully submit to you that it ought not to be done, except upon the clearest evidence and the most unquestionable grounds ; the existence of a doubt should be decisive against such a conclusion.

I need not say to an intelligent and reflecting jury, that the validity of this will can in no wise depend upon the virtues or the vices of the testator. If this will be invalid, no virtue of the testator can sustain it, if valid, no vices of the testator can impair it. Much less can the validity of this will depend upon the consistency of its provisions with our ideas of fairness or propriety, or even with the principles of justice and humanity ; such a test of its validity would be certainly subversive of that absolute control and dominion which the law gives to every man over his own property. The question for your decision is not, is this a fair will, a just will, an equitable will, the will of a right thinking man and a kind hearted father, but is it Thomas Gibbons' will ? If it is, your verdict should be for the defendant. Nor need I say to you, that this is not the place nor the occasion for the indulgence of our sympathy with misfortune, or our indignation against vice, much less are you here to rebuke sin. We are here in the discharge of a high and sacred duty, which is to be performed with a single eye to the law and the testimony, irrespective of our feelings and our sympathies.

The jury rendered a verdict for the defendant.

Upon the coming in of the *postea*, a rule *nisi* was obtained to set aside the verdict and for a new trial.

The argument upon the rule to show cause was had in January term, 1849, before the CHIEF JUSTICE, and CARPENTER and RANDOLPH, Justices. *W. Pennington* and *Hornblower*,

counsel for plaintiff, *Vroom* and *Wood,* counsel for defendant.

*J. C. Hornblower,* in support of rule for new trial.

This case is one of the highest importance, involving the validity and construction of a will under which property is held to a vast amount, and it is one which deserves the fullest consideration. The trial at the circuit was but the breaking of the case ; the verdict was the result of the charge merely, and the law and the facts may here be fully reviewed.

The undue reverence once paid to wills ought not now to be felt in this free country, where the leaning should always be against contrivances to create perpetuities. On this motion, any thing arising on the will may now be considered.

1. The devises to William Gibbons are void in law : they gave no estate known in the law, and the limitation was unlawful, an intention which the law will not support. A grant is always presumed to be on a good consideration. If a condition subsequent be bad, the condition is void and the estate absolute. In case of wills, the devisee must take according to the general and prevailing intent, so as not to disappoint the testator, or not take at all ; and no consideration moving from the devisee is necessary to give the will validity. If the intention on the face of the will be, that the estate must be taken for a particular object, the will is good or bad according to the character of the object and the honesty of the intention. A devise to a man on condition that he would commit a murder would be no devise at all.

I distinguish between the case where there is a further disposition over, and when not. In the former case, if the condition be unlawful the devise is void.

A devisee must take under the will some estate known in the law, or he cannot take at all. This will is *sui generis,* and scarcely to be illustrated by adjudged cases, one in which the testator prays divine aid that he may be able to shut out the poor children of his own daughter from all benefit of his estate.

What estate does W. G. take under this will ? All the de-

vises were given upon special condition : if broken, the property was to be sold, and the proceeds distributed, under the declared intention, that under no casualty should J. M. T., or his descendants, inherit or receive any part of his estate.

The estate given is not a fee simple. It cannot take effect by way of executory devise, for there is legal devise over. Whether the charitable institutions designated could, by the aid of a court of equity, have obtained the benefit of the intended disposition in their favor in case of the death of W. G. without issue, is another question. The limitation over is too indefinite, and not good as an executory devise. The will is incongruous, and attempts to impose limitations on an estate in fee simple, or rather to create some new estate not known in the law. 6 *Cruise Dig.* 449, " *Devise*," c. 17, § 22.

In order to sustain the devise to W. G., the court must go the length of giving him a fee simple, notwithstanding these limitations over. But the intention was that it should go over, and under a limitation that is unlawful. The prevailing intention is one not consistent with legal rules ; it was to strike down one branch of his family.

The following cases were cited and commented on : *Den* v. *Blackwell*, 3 *Green* 387, 389; *Co. Litt.* 223, § 361 ; *Doe* v. *Pearson*, 6 *East* 173 ; 6 *Cruise* 158, § 8 ; 7 *Ib.* 161, § 18 ; *Doe* v. *Laming*, 2 *Burr.* 1108 ; 3 *Peters* 117 ; 3 *Burr.* 1634; *Den* v. *McMurtrie*, 3 *Green* 276, and cases cited ; *Humberston* v. *Humberston*, 1 *P. Wms.* 332.

2. The will of Thomas Gibbons was unlawful, not only as *contra bonos mores*, but against public policy and against all the principles which lie at the foundation of society. Its attempt is to sap those ties which unite human nature. It is not asserted that it is unlawful to cut off a child, even from bad motives ; but it is a principle that never will be recognized, that property may be so tied up as that it cannot be applied to the plainest duties by those to whom given.

The law will not execute contracts for immoral or inhuman purposes, nor will courts sustain devises on such conditions. Suppose devise on condition that a man would not read the Scriptures, or would not sustain his own children, and the

like.    How far can a man go in annexing these unholy conditions ?

The covenant annexed, void as it is in law, characterizes the will.

3. The will shows such hallucination of mind, as against Trumbull and his children, that, in connection with the circumstances which appeared on the trial, it is evident that the testator was not of sound and disposing mind and memory at the time of its execution.    It is an insane mixture of religion and impiety, such as no mind could produce, unless off its balance and unhinged, at least on one point.    Charity requires us to suppose that there was insanity, either general or partial.    The counsel referred to, and examined the evidence given on the trial in support of this point.

4. The will was the result of undue influence, and was procured by the corrupt and fraudulent conduct of the principal devisee.    Such is evident from the will in connection with the covenant, the diary, the libel, and the circumstances under which the will was made, as shown by the testimony on the trial.    The testimony was here again referred to at considerable length, and commented on.

5. The judge, on the trial, misdirected the jury.    The view taken by the judge of the character of the estate given was not in accordance with the true view which ought to have been taken.

Too much weight was given in the charge to the testimony of the subscribing witnesses.

We insist the judge was too general in his remarks in regard to undue influence.    Whether the circumstances shown in this case proved undue influence, ought to have been left to the jury..    Deception without coercion would be sufficient.    The judge went too far.    The opinion of the court on matters of fact should be given as opinion, and was not by way of direction.    *Canal Co.* v. *Knapp,* 9 *Peters* 541, 567 ; *Tracy* v. *Swartwout,* 10 *Ib.* 80, 95 ; *Firemen Ins. Co.* v. *Walden,* 12 *John.* 513, 517.    Our allegation was, that the will was made under the control of the son : the charge assumes that the testator was one whom no human being could control.

The court charged that there was no delusion upon which the resentment against Trumbull proceeded. We did not pretend that there was any in the commencement, but we contended that the will was made under a monomaniacal feeling against Trumbull, or under deception and influence by the son. The general history of his conduct · was the evidence of his monomania.

The case is of great importance, and deserves to be reheard after a deliberate review of the law and the facts, and when an opportunity may be had for a more satisfactory trial than was possible in the first instance.

*P. D. Vroom*, contra.

The first general ground of the plaintiff is, that the devises are void in law, because, he says, they give no estate known in the law. The substance of the will is, that if W. G. dies without issue and without will, then the property is to go over; and so if he dies leaving a will giving the property, or any of it, to Trumbull or his family, then, also, the property is to go over to the charities named.

The proposition is novel, that the whole will must fail because, as alleged, some of the conditions are illegal. Certainly the limitation over is good on failure of issue. The order of sale makes no difference; still the limitation over to the charities is good. The devise is one over on the happening of a certain event, if on definite failure of issue, then it is a fee simple with an executory devise over; if on an indefinite failure, then an estate tail, an estate known in the law, though modified here by statute.

Suppose no donee over who could take, still the first estate given would be good. If the condition tended to perpetuity, the condition would be void, but the first estate would stand.

But looking at the further limitations, it is clear that the testator intended a definite failure of issue, the contingency, *dying without will,* clearly referring to the death of the devisee.

As to the subsequent condition in regard to the Trumbull family, it is good or bad. If good, in case of not being per-

formed the estate would be lost by forfeiture. If bad, by a condition subsequent, the estate would, of course, simply stand free of the condition. *Litt.* § 360; *Co. Litt.* 223, *a; Den* v. *The Larwence Church, Spenc.* 551.

The leading intention was to give the property to W. G. coupled with the condition' in question; if the condition be unlawful it falls, but the general intention is not affected, and the estate remains.

2. The will is not void because against public policy. There is no legal immorality in the exclusion of a child. A will is not void because the offspring of embittered feelings; it may be legal, and yet neither just nor generous.

3. There is nothing to show hallucination of mind. The will may seem a strange will, but still religious professions coupled with harsh provisions in a will do not show insanity. The profession of faith and the exercise of inhuman feeling would not show insanity. The will of an infidel would not be avoided because of insincere professions.

What is monomania? Dr. Darcy gives us no precise definition, though he seems to think it well understood at the present day. It is a novelty of the present century. Dr. Rush knew nothing of it. Dr. Darcy says it consists in derangement or obliquity of mind on a single subject, which the subject cannot be argued out of. *Pritchard* (21) says there must be a total delusion as to the subject matter.

But Lord Erskine, on the trial of Hatfield, laid down the true test of insanity, which is delusion, not false reasoning from facts. The causes of irritation in the case of the testator arose from no delusion, but from facts. Offence was taken at the actual conduct of Trumbull, and not at fancied matters having no existence. Nobody, not Trumbull himself, dreamed that Gibbons was a monomaniac: and unfounded prejudices even are no ground for setting aside a will. *Attorney Gen.* v. *Parnther,* 3 *Bro. C. C.* 443-4; *Greenwood* v. *Greenwood,* 13 *Ves.* 89; 3 *Curteis* 337 (7 *Eng. Ecc. Rep.* 432); *Fulleck* v. *Allinson,* 3 *Hagg.* 527 (5 *Eng. Ecc. Rep.* 196).

4. In regard to fraud and undue influence, the matters urged under this head were pressed before the jury. No evidence

was given which will support this point. The kind offices of a son, or any one else, do not form what is called undue influence, which must be such coercion as destroys free agency. *Williams* v. *Goude*, 1 *Hagg. Ecc. Rep.* 577; *Bird* v. *Bird*, 2 *Ib.* 142; *Mountain* v. *Bennet*, 1 *Coxe Ch. Rep.* 353.

5. As to the alleged misdirection. The charge is to be treated as a whole, and not by dissecting every paragraph and weighing each isolated part. The charge in regard to the estate was in accordance with the law.

No undue weight was given to the evidence of the subscribing witnesses. 3 *Wash. C. C.* 586; 4 *Ib.* 268; 1 *Green's Ch. Rep.* 11; 2 *Ib.* 573, 577.

Nor did the court go too far in the directions to the jury as to the effect of the testimony.

*Geo. Wood* (of New York), on the same side.

A variety of errors in regard to the trial and to the charge of the judge is alleged, which, if founded in fact, were sufficient to set aside the verdict. First, as to the objections which appear on the face of the will.

1. It is said that the disposition is immoral and impious. The immorality and impiety are in the motives which led to the disposition. We must distinguish between the subject matter and mode of disposition, and the motives which led to it; a distinction not adverted to on the other side. No authority has been adduced, none could be found for the position, that the motives which led to the disposition can be assumed for avoiding the will. 6 *Paige* 151.

We have nothing to do with the motives which led to the disposition. *Stat pro ratione voluntas.* The power of disposition is a cherished privilege. It encourages industry. It comports with freedom of action. It enables a man to control his family, and it is generally well when he keeps the staff in his own hands. What a scene of litigation would be produced were courts to scan the motives which influence men in the disposition of their estates, and set aside wills because unequal or unjust! Is a jury to inquire into the merit or demerit which

led to a given disposition? Is evidence of good or bad conduct to go before a jury in order to support a will?

The will is not affected by the covenant, which is now admitted not to be part of the will. It is inoperative, and does not for this reason affect the will. But it is, at most, nothing more than what is implied by the acceptance of the devisees, which is an implied agreement to comply with the terms. The design was probably merely to impress upon the mind of the devisee what he was expected to do. There was no error in the charge, that the motives, even if immoral, do not affect the will.

But it is said that the conditions are illegal, and that the charge is wrong because it does not sustain this position.

The conditions, which are all embraced in the latter clause of the will, are all subsequent in their nature, to take effect upon the death of the testator and after the will should go into effect. If illegal because immoral or against public policy, the condition is simply void, for which position certainly it is not necessary to cite authority.

But the conditions are valid. The one drawn in question is simply not to alien to a particular person or to his family. 4 *Kent* 131 (*5th ed.*); 1 *Preston on Estates* 477; *Co. Litt.* 223, § 361; *Den* v. *Blackwell*, 3 *Green* 389. The case of *Perrin* v. *Lyon*, 9 *East* 171, shows the extent to which the restraint may go when the condition was, that the devisee should not marry a Scotchman, which was held good.

It is no objection that condition is not confined to property given by the will, provided it is not *per se* unlawful. Devise is good on condition that claim should not be made to the property.

The devise is not an estate tail, for the limitation over takes effect on a definite failure of issue. The effect is to give Mr. G. an estate in fee with a conditional limitation over. It is said, however, that there is no estate over limited, but merely sale directed, and proceeds to be paid to certain charitable institutions. True, but does not affect the disposition. There is no illegality in the disposition over, and no violation of the rules in regard to perpetuities.

But suppose limitation over not good, the only effect would be that the estate would be absolute in the first devisee.

In regard to the novel idea of the general and particular intent said to appear in this will, it is certainly not drawn from the rule in *Shelley's case.* Earnestness of expression is not what constitutes, in the legal sense, the general intention in a will, but the magnitude of the estate.

3. But as to objections extrinsic to the will : and, first, as to undue influence, which constitutes a prominent objection to the charge. It is attempted here to narrow unsafely the ground within which a judge may operate, which would be to render a jury an unsafe tribunal. Undoubtedly he has a right to give his opinion upon facts, though not to take the case from the jury, where there is evidence upon which that jury might rightfully find a verdict. It is his duty to recapitulate, and to distinguish between leading and subordinate facts, and to present the issues in a distinct manner to the jury. If the evidence is clear on one side, he has a right to call the attention of the jury to this, and to prevent them from running off on slight inferences.

A judge has another right, or rather duty. When some important fact is necessary to be shown, in order that a party may succeed, and the evidence fails, or is very slight, it is his duty to say so, and not to permit the jury to fall into error, when in such case the verdict must be set aside. It is particularly necessary in cases of seeming hardship, when the jury may be readily led astray by the impassioned eloquence of able counsel. When such efforts to carry a cause are made, as were in the present case, the judge is never to be deprived of the power of sifting evidence and of giving his own opinion ; thus leading the minds of the jury from the blaze of eloquence to the light of truth.

There is not a particle of evidence before that jury such as is necessary to establish the charge of undue influence. The sort of influence which will invalidate a will must amount to moral coercion, if not to physical duress. It has been called pressing importunity, when the will is yielded to the force of such pressure and destroying free agency. It must not be the

influence of affection nor of mere flattering attentions.    1 *Coxe's Ch.* 352 ; 13 *Serg. & Rawle* 269.    The evidence shows that the mind of the testator was not thus to be operated on, and that its vigor continued to the last.

The counsel referred to the will of 1819, of which this will was almost a copy, to the cross-bill filed by Trumbull, and to other causes of exasperation on the part of the testator against Trumbull, and examined the testimony in regard to the alleged undue influence at some length.

4. But the great point is monomania, alleged to have been practised on by the defendant, William Gibbons, which I have placed under the head of matters extrinsic to the will, though aid is sought on the opposite side, on one point, from the face of the will.    It is a strange idea that a religious appeal, because connected with a harsh disposition, should be considered as evidence of insanity.    Much of this character has in all ages evinced the wickedness and hypocrisy of men, but it has never been held a test of insanity.    In all ages have men's mouths been filled with religious professions while their hands have been red with blood.

But it is said that there was moral insanity, although not coupled with delusion.    This is a kind of insanity much in vogue just now, but had it been set up in court as an excuse for crime in Mr. Gibbons, while living, the judge to whom offered might have lamented the necessity for punishment, but he would have gone on and administered it, as a teror to evil doers, with slight regard to such pretence.

The counsel here examined the evidence at considerable length, to show that the conduct of the testator, at the period when this will was made, and at other times, was the natural result of irritated feelings, which, if not justifiable, are very natural under the circumstances and the supposed causes of offence which arose from time to time.

*W. Pennington,* in reply, adverted to the great importance of the case, the haste of the former trial, the preparation for which was made very much in the dark by the counsel of the plaintiff; the singularity of the will, and the circumstance that

the lessors of the plaintiff were utterly cut off by their ancestor without one cent. He recapitulated the prominent topics on the part of the plaintiff, and urged that the heirs-at-law, under all the suspicious circumstances connected with the making of this will, ought not to be cut off without an opportunity of another verdict, by which their claims might be tested. The terms of the will are very extraordinary, the will is very peculiar, the mind of Mr. Gibbons brooding for years on one idea, the suspicious circumstances under which the will was made, the imperfect opportunity on the first trial to obtain testimony, all demand further investigation; and particularly as, under the strong charge of the judge, no room was left for action on the part of the jury.

The opinion of the court was delivered by

CARPENTER, J.    The amount, directly or indirectly, involved in the present controversy, rather than any intrinsic difficulty in the questions raised, has given importance to the argument of this cause.   A new trial is sought, chiefly on the ground of misdirection, partly in regard to matters apparent on the face of the will, and partly matters extrinsic, arising in the course of the trial.

1. I shall first make some remarks upon the construction of the will, remarks which I intend to apply only to the character and validity of the disposition of the real estate in this state. I shall look for the legal character of that disposition, not in the motives and feelings which actuated the testator, but in the nature of the disposition itself.   That the will was the offspring of an immoral and irreligious state of feeling; that the motives which led to it were uncharitable, anti-christian, or even impious, according to my judgment, can have no effect on this branch of the inquiry.   What, then, was the disposition made by the testator?

In the first place, he devises certain enumerated estates, among them the premises in controversy, to William Gibbons, his heirs and assigns for ever, and adds, that in case William Gibbons should die without lawful issue, the said estates should go over to certain specified religious and charitable institutions.

It is not necessary to inquire whether these words, standing alone, would or would not create an estate tail. They do not stand alone, but are qualified and controlled by subsequent dispositions in the will. The testator then adds these words to the clause already referred to:

· "I do hereby mean and intend that all the property, real and personal, given, devised, and bequeathed to my said son, shall by no casualty in this life go to John M. Trumbull, or all or any of his children, or one or more of their or either of their descendants." And in the subsequent clauses he attempts to carry this declared intention into effect. In a succeeding clause, other estates are also given to William Gibbons, his heirs and assigns for ever, with a limitation over in case of his death without issue or without such will as would exclude Trumbull and his family from the enjoyment of any part of his estate. But the conditions attempted to be imposed are all to be found in a subsequent clause of the will, which, therefore, it will only be necessary for me further to recite: " And my said estates, in the state of Georgia, New Jersey, South Carolina, and New York, are given, devised, and bequeathed to my said son William Gibbons, upon the following further conditions, that is to say: if he should die without any lawful issue and without making a last will and testament, or if he should make a last will and testament, and thereby devise and bequeath any part of my estate devised and bequeathed to him, &c., to John M. Trumbull or to his children, &c., or their or either of their descendants, or to any person in trust for all or either of them, or any part of the proceeds, or as a part of his estate while in my possession; or if it shall appear after his death that my said son William Gibbons had, in any period of his life after this date, given any property of any kind, or money arising from what funds or source it may, (even if it should be from property I have already given my said son) to the said John M. Trumbull, or either of his children or descendants then, and in any such case the estate, by this my will devised and given to my said son, shall go to the public uses herein before expressed, and not pass by any such deeds or testamentary dispositions." To which clause the testator

added a most extraordinary prayer for success in this unnatural exclusion.

These limitations and conditions, so attempted to be imposed on the principal devisee, and which are drawn in question in the present controversy, stripped of the peculiar phraseology with which the testator has chosen to invest them, I think will be found to be substantially the following: If William Gibbons should die without lawful issue and without will, or if he should make a last will, and give or devise any part of the estate derived from the testator to John M. Trumbull, or any of his descendants, or if it should appear, after the death of William Gibbons, that he had ever so given any of such estate, or any part of the proceeds thereof, (or indeed funds arising from any source) that then the estate should go over to the charities specified in the will. It is to be seen whether this devise gives any estate known in the law, whether the conditions annexed are unlawful, and, if so, whether they avoid the primary estate, or whether the whole disposition is void because against sound morals and against sound policy.

The position taken by the defendant's counsel is clearly sound, that no court will attempt to set aside a will on account of its disapprobation, however strong, of the motives that actuated the testator, or of the disposition made by him. The power of disposition belongs equally to the good and to the bad, and wills cannot be set aside merely because unequal or unjust. If capacity, formal execution, and volition appear, the will of the most impious man must stand, unless there is something, not in the motives which led to the disposition, but in the actual disposition, against good morals or against public policy. It may be harsh and severe, it may be extremely cruel under some circumstances, to disinherit one child, and to bestow the whole estate upon another, but if the testator be of disposing mind and memory, and duly execute such will in the forms prescribed by law, no court can interfere. If this will, or any of the devises contained in the will, be void, it must be on other grounds than those to which I have referred.

When a devise over depends upon a definite failure of issue, an estate in fee with an executory devise over is created, but

when such devise over is made to depend upon an indefinite failure of issue, it becomes a contingent remainder limited on an estate tail. That a definite failure of issue is here meant is very clear, the dying without issue being connected with the further contingency of dying without making a last will. There is a strong analogy between this limitation and one lately under the consideration of this court, in the case of *Armstrong* v. *Armstrong*, 1 *Zabriskie* 509. In that case, after words of disposition, which, standing alone, would have carried a fee, the testator added a limitation over, in case the first taker died without heirs and *intestate*. The court held that a power of disposition by will was implied; that such power of disposition was inconsistent with, and defeated the limitation over, and that consequently the estate was absolute in the first taker. See, also, *Cuthbert* v. *Purrier*, 1 *Jac*. 415; *Green* v. *Harvey*, 1 *Harr*. 428; 4 *Kent* 270, &c. If the language of this will comes within the case of *Armstrong* v. *Armstrong*, the limitation over in such case will not be good by way of executory devise. If it were simply in case of dying without issue and without will, in such case, the limitation over not being good, the first estate would become absolute. But this phraseology is coupled with the further conditions which are attempted to be imposed. The power of disposition by will is not absolute; but there is this further condition annexed, that if the devisee should in any way give any part of any property derived from the testator to Trumbull, or to any of his family; the estate should be forfeited and go over. Whether good or bad, this is a condition subsequent in its very nature. It is a condition to defeat the estate given, and not one upon which the estate was to vest. If a conditional limitation because an estate is limited over on the breach of the condition, still the limitation over was intended to take effect only on a contingency which must happen, if at all, subsequently to the vesting of the primary estate. If, then, the condition be bad, the estate is discharged of the condition, and is absolute in the first taker.

It has, however, been urged by the defendant's counsel, that the condition is one simply in restraint of alienation to a particular person and to his heirs, and that such condition is

good.   It is not necessary for the present purpose to settle whether the condition be good or .bad.   The present case, perhaps, goes much farther than any case cited on the argument, being an attempt, not merely to restrain alienation by grant or devise to Trumbull or his heirs, but to shut out one branch of the testator's descendants from the possibility of receiving aid from the devisee, whatever might be their necessity or the urgency of their distress.   The testator makes it a condition, that if the devisee should give any property of any kind, or money arising from any source, to Trumbull or any of his descendants, then the estates should go over.   Such condition might well be held bad without infringing the generally received rule as to partial restraints or alienation ; but, as I have already said, it is not necessary to consider or to settle the question.   Suppose the conditions to be declared bad as *contra bonos mores*, as an attempt to impose an uncharitable unchristian restraint upon the devisee, still the primary devise would not fail ; it would be simply discharged of the condition, and rendered absolute.   The authorities are clear, and further discussion on this point seems unnecessary.

2. But it has been urged with great earnestness, on the side of the lessors of the plaintiff, that there was hallucination of mind on the part of the testator towards Trumbull and his family, a causeless and unwarrantable dislike amounting to monomania, and that this state of feeling was caused, or at any rate practised on by the son, who thus obtained the disposition in his own favor.

Every person is presumed to be of sound mind, until the contrary is proved ; it is therefore incumbent on the party attempting to defeat a will on the ground of the testator's insanity, to prove the existence of such disability.   The rule is well established by authority, and it is one which is in accordance with sound reason.   He who wishes to impeach a will for such cause must support his allegation by proof, before he can overcome the presumption which the law raises of the sanity of the testator.   *Shelford on Lunacy* 274 ; *Sloan* v. *Maxwell*, 2 *Green's Ch. Rep.* 581.

This is not one of those cases in which it is a question, what

amount of capacity will enable a testator to dispose of his es-
tate, or what weakness of understanding will disable him
from so doing. It was not contended in the argument, that
there was any thing in the case to show general insanity or a
general want of testamentary capacity on the part of the testa-
tor. He was a man of unusual powers of mind, and, as the
evidence shows, he retained those powers nearly or quite to
the close of his life, certainly down to the period of making
this will. But while it is admitted that he was a man of more
than ordinary vigor of intellect, yet it is said that he labored
under a morbid state of mind, of the character already mentioned,
and that the will was the offspring of such feelings.

When delusion exists in the mind of a person on one or
more subjects only, it is termed partial insanity. I do not
question but that partial insanity will invalidate a will which
appears to have been the direct result of such insanity, though
the testator, at the time of making it, may have been sane in
other respects upon ordinary topics. The great case of *Drew* v.
*Clark*, 2 *Addams* 279, may be considered as establishing this
doctrine. The testator in that case harbored the most unfound-
ed and unreasonable impressions in regard to the character
of an only daughter, against whom, in consequence, he en-
tertained an unnatural dislike. He imagined that the daughter
was vile, profligate, and depraved in the highest degree, and
treated her accordingly with the utmost severity, and even
cruelty, and finally cut her off in his will with an inadequate
provision. It was a dislike founded purely on delusion. It
was satisfactorily shown, that while this delusion had gained
such possession of his mind that nothing could shake his be-
lief, yet, in point of fact, she was amiable in disposition, en-
gaging in her manners, of superior natural talents, diligent,
dutiful, affectionate, modest, and virtuous, and giving no oc-
casion for the extraordinary feelings exhibited by the father.
The will, being proved to be the direct offspring of this delu-
sion, was set aside and declared void by the distinguished
judge before whom the cause was first heard ; and his judg-
ment was subsequently sustained by the courts before which,
by appeal or otherwise, it was brought for review. The case

turned on the fact of a remarkable delusion, the only clear test of insanity, unquestionably proved, and it has since received the unqualified approbation of the profession. See S. C. on application for commission of review. 1 *Russ. & Milne* 103, and *Shelford* 297.

In what does the alleged delusion exist, or how has it been exhibited in the present case? I have carefully looked through the testimony to be found in the case prepared, and in the documents, including the diary and the libels, which evidence I am not disposed to recapitulate or record. It is sufficiently referred to and stated in the charge of the Chief Justice for the present purpose, and it undoubtedly exhibits a sad instance of the extent to which family feuds may be carried. There seems to have been, on the one side, an imperious and haughty temper sustained by wealth and power, and restrained by no softening influences from moral or religious principles. On the other, as I take it, there was great imprudence on the part of a daughter and son-in-law in dealing with the errors of an uncontrollable and violent parent, upon whom they were dependent. But I can find nothing like delusion or insanity. The first dissatisfaction and incipient dislike were heightened, by continued disputes and irritation, into settled aversion and enmity; but this was the result of obvious causes having an actual existence, and not the consequence of imaginary difficulties. The rebukes for alleged licentiousness, the disputes and difficulties with regard to property, threatened divorce, the libel suit, all these matters, which embittered the feelings of the testator in the highest degree, were not mere imaginary causes of offence. These and other successive bitter quarrels between the testator and his son-in-law, daughter, and family, certainly occurred, and they account for the provisions of the will, by which the latter were disinherited, without any necessity to resort for explanation to monomania or any other form of insanity. No one witness produced, not even Mr. Trumbull himself, towards whom this hallucination was said chiefly to exist, has expressed the opinion that the testator was in the slightest degree insane.

The idea of undue influence need not be resorted to in order

to account for a result which might naturally flow from causes such as have been merely alluded to : certainly it must be clearly proved, and cannot be inferred under such circumstances. It has been said, that the influence to vitiate a testamentary act must amount to force and coercion destroying free agency, importunity which could not be resisted, and which was yielded to for the sake of peace, so that the motive was tantamount to force or fear.

It is not the influence acquired by kind offices, or even by persuasion unconnected with fraud or contrivance ; though if persuasion or other means of influence be connected with fraud, it may admit of a far different consideration.    Fraud may be employed as means of influencing, and may afford ground for impugning a testamentary act no less than force, and the peculiar relation between the testator and the party benefited, as client and attorney, &c., when the former was weak and liable to imposition, has been held to furnish strong presumptions in regard to undue influences.    But I can see no such evidence in this case as will support the charge.    No direct coercion can be pretended ; but the relation between the testator and his son, in connection with the circumstances under which the alienation in the family took place, and in connection with the circumstances under which the will was made, and the character of the dispositions for the benefit of the son, are relied on as proving or authorizing the inference that the prejudices and feelings of the father were practised upon.    These circumstances were recapitulated by the judge in his charge, and submitted to the jury as grounds for a vigorous examination, and they would, as stated, go far to raise suspicion, if the father had been a man likely to be controlled or influenced, if the disposition had not been in accordance with intentions long previously expressed.    The employment and payment of the scrivener by the son, the aid he gave in drafting the will, his conduct towards Trumbull, his connection with the printing of the libel, and the part taken in drawing and signing the covenant, undoubtedly deserved attention at the trial, and under some circumstances might have weighed much in the investigation.    Yet still they are but mere grounds

of suspicion, while the character and conduct of the testator repel the idea that he was operated on by any such extrinsic influence as could be effective to set aside his will.

The father was a man who, according to the testimony, could not be controlled, "a man of strong mind, strong passions, strong prejudices, and strong self-will." He had quarrelled with Trumbull years before: additional causes of irritation had from time to time sprung up, in regard to which there is no proof that they were stimulated or aggravated by the son; and even if such had been the case, it could scarcely have been urged as a ground for impugning a will made so long subsequent. He had repeatedly declared, that in a certain event, he would cut off Trumbull and his children from all further benefit of his estate; and when that event occurred, which depended on the action of Trumbull himself, he reiterated his determination, to which he unalterably adhered. In 1819, he made a will, in which he carried that determination into effect, and in two or three subsequent codicils, all, as well as the will just referred to, his own handwriting, his continued action was in perfect accordance with his previously declared intentions. These former wills and his antecedent declarations and conduct were all in entire accordance with the actual disposition finally made, and leave no other conclusion on my mind but that the last will was the result of a deliberate determination on the part of the testator, and not of any extrinsic influence. In my judgment the jury rightly responded to the inquiry, so emphatically and so properly put to them in the charge, that they were to inquire, not whether the will was a fair will, a just will, an equitable will, the will of a kind hearted and right thinking man, but whether it was the will of Thomas Gibbons. The judge properly put the case to the jury with a directness and an emphasis suitable to the occasion. No other verdict could have stood, and it was right that the jury should not be permitted to err from feelings which possibly may have been excited by the harshness of the will, when the evidence was clear and the case free from doubt.

I have not thought it necessary to notice some of the minor points argued by counsel, because, in the view I take of the

case, they become immaterial.   I have come to the conclusion, after a careful examination of the case, and after an anxious attention given to the argument of the respective counsel, that there was no misdirection by the judge; that the verdict is in accordance with the evidence, and that the rule should be discharged.

The CHIEF JUSTICE and RANDOLPH, Justice, concurred.

Rule discharged.

CITED *in Boylan* v. *Meeker,* 4 *Dutch.* 291; *In re Gleespin,* 11 *C. E. Gr.* 529.